Case number 20-1238 et al. City of Salisbury, North Carolina, Petitioner v. Federal Energy Regulatory Commission. Mr. King for the petitioner, Mr. Fitch for the respondent. Good morning, counsel. Mr. King, we'll hear from you. Thank you, your honor. Good morning. May it please the court, my name is Robert King. I'm with the Brooks Pierce Law Firm and the North Carolina Bar, and I represent the petitioner, City of Salisbury in this matter. I appreciate and frankly am thrilled to appear before this court. As previously indicated to the clerk, I would like to reserve two minutes for rebuttal. This is a case with a long history, a lot of facts, a lot of sub-issues. However, the overarching issues relate to the respondent, FERC's interpretation of Condition 9 of the Water Quality Certification issued by the North Carolina Department of Environmental Quality. Respondent has interpreted the North Carolina Water Quality Certification Condition 9 to allow flooding of the sole source of the city's drinking water supply, which in itself would be a water quality violation. That is, FERC has said that what DEQ intended was that Cube Hydro to continue to commit water quality violations, which is a legal oxymoron. You cannot simultaneously comply with a water quality certification and at the same time violate water quality standards. As a result of respondent's facially incorrect interpretation, the petitioner, City, has been told that it is just going to have to live with the flooding of its pump station with contaminated sewage-laced water, the sole source of drinking water for over 52,000 people. I would like to talk about the key mistakes and really one key mistake that got us to where we are today, but before I do that, I would like to step back and compare where we are today, Election Day 2021, with where we were on a specific date, April 18, 2008. And I want to do that because... details of your presentation. Isn't the primary issue before us a pretty straightforward question of, I guess it's not statutory, but permit construction, which is whether the phrase consistent with Salisbury's design in that second clause of 9B, which is improved access to the pump station consistent with Salisbury's design, whether that consistent with Salisbury's design phrase refers all the way back to physical modification in the first clause? That's what's before us, right? Well, I would agree, Your Honor, that the interpretation of Condition 9 of the Water Quality Certification is the issue. I don't think it is quite as narrow as the Court is putting it, and if the Court will bear with me, I'd be happy to explain why I think, while I think the Court is correct that we are talking about that particular paragraph, I think that the issue that is presented is a little bit broader. And the reason that I wanted to look at where we were and where we are today really goes to the issue of interpretation. Okay, I mean, I'll let you go on, but just so you know where I am, as I understand the case, you need to persuade me that the text works in that way in order to prevail. So you can either do that or explain to me why my framing is wrong. Okay, I would be happy to do that. I'm always lucky to never tell the judge that they're wrong, so I will tell you that I think there's a slightly different take on it. And so if I can back up, the reason I wanted to go back to April of 2008 is because by that point, the petitioner had a pump station at this location on the Yadkin River for almost 90 years. That pump station was experiencing flooding. The amount of flooding was getting worse. And to state the obvious and to inject a little common sense, and common sense is certainly one of the things that's supposed to be applied when you have ambiguous language, you don't want to flood buildings for all sorts of reasons. You damage the building, you damage what's inside the building, you create health and environmental issues for the people who then have to go into the building. And if you come up with a list of the things that you really, really don't want to flood, one of them is going to be a pump station. Because if that is damaged or it is destroyed, then where are you going to get your drinking water? But on April 18, 2008, the date that I picked, the city of Salisbury had a good day. And the reason was because the environmental impact statement put their finger on the cause of the flooding. And the cause of the flooding was Q-Hydro, Respondents Licensee. And the people of the city of Salisbury were relieved by that conclusion because they knew what the problem was, they knew what the problem needed to be fixed, and they knew who was the cause of it. Mr. King, in all fairness, isn't the problem not just that flooding occurs, but that flooding occurs in a manner that prevents the pump from working. And so therefore, you don't have the clean water that the city needs. So imagine a world in which a solution would allow the pump to operate notwithstanding any flooding. And I think that's what Q-Hydro has proposed here. Am I wrong about that? Well, Q-Hydro has presented two options, although it's really a fake choice. They have said that they will either basically retrofit the building at a cost of less than $3 million, or they will build a new building for a cost of $30 million. So your honor is absolutely correct that what Q-Hydro has said is, we just have to live with a flooded building and that they will retrofit it to make that work. Yes, but I guess the point that I'm homing in on is that just because the building is flooded doesn't mean you necessarily reach the disastrous consequences that you suggest, which is that the town has no clean drinking water. Q's solution, I understood, was to allow for the pump to continue to operate notwithstanding any flooding. Well, frankly, your honor, I'm not sure I agree with that, and the reason is this. What we are interpreting here is the state's water quality certification. The state's water quality certification, by definition, according to the certification itself, according to the Clean Water Act, has to involve compliance with water quality standards. Allowing this building to flood is in itself a violation of water quality standards whether the pumps continue to work or not, and that's not my opinion. That's the opinion of DEQ. When Q-Hydro generated their initial draft report, and the court will recall, there were three plans that were submitted that were prepared prior to the Q-Hydro report or the Q-Hydro plan. Every one of those said, we're not going to flood this building. Everybody understood that that's not where we're going to end up. I understand, but getting back to Judge Tappas' question, we're not going to flood this respond to his question as to what Condition 9b should be read to me. I will absolutely do that, your honor. I'm going to skip over to the interpretation issue. May I address briefly the deference issue, or should I go straight to the issue of interpretation? However you would like. Okay, your honor. I think the deference issue requires a little bit of conversation, although I think it should be quite brief. Let's start, why don't we start with the text, because if it's, if the text is clear, then we don't need to, one way or the other, we don't need to get to deference. Okay, thank you, your honor. Your honor is absolutely correct. As I said at the outset, the issue is the interpretation of Condition 9. I think everybody can agree that this is not well written. I had written in my notes that this is something that was clearly written by an engineer. I don't, I don't fault engineers. I can't build a bridge, and some engineers cannot write clear sentences. It is the nature of the world that courts, and in this situation, FERC, are presented with issues where the language is not clear, and the language is not clear as to what is intended in every respect, but two things are clear in reviewing the language here, and the language, if the court will bear with me, provides physical modifications to the facility, such as a protective dike, the pump stations, improved access to the pump station with the road system with the city of Salisbury assigned, or other feasible options for achieving the same results. Now, I don't, I don't know how many times I've read that. I'm guessing the court read it quite a few times. If somebody handed me that and said they explained that to me, I'm not sure that anybody could really do that, so then the question is, what can you derive from this, and then what do you do given the fact that it is unclear? Two things you can derive from this, first of all, is that whatever the state is talking about, the state is requiring compliance with state's water quality standards. That is, saying that you can comply with the water quality certification while you violate water quality standards is like saying you're pregnant and not pregnant at the same time, so one thing that is clear from reading condition nine is that whatever the answer is, there has got to be compliance with water quality standards, and you cannot get compliance with water quality standards by flooding the station. The other thing that's Where do you get that? What do you get from condition, that condition nine incorporates all of the state water quality standards? Your Honor, the purpose of the Clean Water Act for water quality certifications is that the state is either saying this complies with water quality standards, or if you do the following things, you will comply with water quality standards. It is actually written in the water quality certification itself, Your Honor, which says, and if I can read here, the application and supporting documentation provides adequate assurance that the proposed work will not result in a violation of water quality standards. I'm sorry, where is that? What are you reading? And, Your Honor, I know it's in the water quality certification. I'm going to see if I can put my finger on it, and I don't know why I did not write specifically in there, but I will get that side to the court, but it says in the water quality certifications that the activities will or must comply with water quality standards. So, one of the two things that is clear when you read this is that whatever the plan is, the plan has got to bring the operation into compliance with the water quality standards. I'll get the court the specific side to that. Seems to me that the compliance with the requirement of compliance with the state water quality standards may be, and I take your word for it, applicable here, but I don't see that it's applicable through 9b. Just assume for a second that it's not. It's your position, I think, that CUBE must comply with the water quality standards, even if it's not in 9b, correct? You're exactly right, Your Honor. And other provisions in the plan repeatedly call for, require CUBE to obtain all the permits necessary to carry out its plan. Correct. What they're telling us is they won't be able to get that permit. That is correct, Your Honor. Well, maybe you're right, maybe you're wrong, but why isn't that something to be determined later on? Well, there is no later on in this situation, Your Honor. That's one of the problems. Why would CUBE pursue this investment and this expense if it's so clear that it will not qualify under the DEQ? Well, and that's a great question, Your Honor. We have assumed for the past 15 years that FERC was going to do, not FERC, that CUBE Hydro was going to do what it was required to do. And at every term, they have not done that. And much to our surprise, the folks at the respondent have allowed them to do that. There were only three plans before, and every one of those plans would have required compliance with water quality standards. And yet, basically, out of the blue, CUBE Hydro came in and said, look, we understand that every plan that has ever been generated said you will not end up with a flooded building. Two of the plans said we're going to build a new building. One of the plans said we're going to build a protected background on the building. Everyone understood that you were not going to be flooding this building. That's, frankly, a matter of common sense. Now, when CUBE Hydro generated their draft report, a month later to the day, the state of Florida, and I'm specifically looking here at the joint appendix at 391, CUBE Hydro generated their report on May 14, 2018. On June 14, 2018, DEQ looked at that report and said, well, wait a minute. And if I could read through the coordinates, here's what DEQ said about CUBE Hydro's plan, which is the plan that respondent ended up adopting wholesale. And DEQ said the proposed plan does not address impacts from flooding to the raw water intake. Our understanding from the city of Salisbury is that they have experienced increased O&M and equipment damages to the water intake due to flooding. Please continue to work with the city of Salisbury to address any concerns they may have and modify the plan as needed to address those concerns. So, we clearly- The plan doesn't address the effects of flooding, right? Correct. Modified in order to address the effects of flooding, that doesn't mean it has to prohibit flooding, it has to address the effects. Well, your honor, race is a good point. I would submit to the court that I believe that what DEQ is saying is that flooding in itself is prohibited. Well, that's what they say, but they didn't say that. They said you've got to address the effects of flooding. Okay, and your honor is correct. So, let me do this. If I can go back to condition nine, I was mentioning earlier what it is that we know condition nine means because it's not clear what everything in condition nine means. One is you've got to have compliance with water quality standards, and the other is that there is something called the city of Salisbury's design. That is a thing. There were three possibilities as to what could have been referred to there. Any of those possibilities, each of those possibilities meant that you were not going to be flooding this building. That was what everybody had agreed to. But, Mr. King, the consistent with city of Salisbury's design phrase, and I think this goes back to Judge Katz's original question, seems to be related to access to the pump station with the road. So, can you explain why that is not the right reading of this condition nine provision? Well, I would start by saying, your honor, that that is not what FERC said is the basis for adopting the plan. They originally said what your honor was saying, that this is really something that DOT should be concerned about, access to the building, and that's what the city of Salisbury's plan means. I'm just looking at the text. I'm just looking at the text, right? It says, improved access to the pump station with the road consistent with the city of Salisbury design, and you seem to want to read a comma in there such that consistent with the city of Salisbury's design is modifying something else, and I'm just trying to understand why that is. Well, I would put it this way, your honor. If we could understand exactly what DEQ was saying by reading that text, I don't think we would be here. I think everybody would agree that this is a poorly written sentence, and so the question is, what does it mean? Your honor is exactly right. There is a provision in there that refers to the city of Salisbury's plan. So, when the court or FERC is faced with ambiguity, we have a toolbox full of options that we use here. Canons of construction are one of them. I mean, canons of construction are sort of like the bible. You can find something in there that suits everybody's goals, and this post hoc rationalization from FERC that that's the interpretation that was being used. Well, for those of us who take text and canon seriously, why don't you try to parse it? Because I have to say, to me, it's not entirely clear, but to me, the most natural reading of 9b is it parses into three basic units. One is physical modifications to the facilities, such as a protective diaper pump station. Second one is improved access to the pump station with the road consistent with Salisbury's design, and the third is other feasible options for achieving the same benefits. I think that's the most natural reading. So, you're welcome to persuade me otherwise, but that's how I read the text and the grammar. Your honor, look, I agree with the court that there are multiple ways that you can read this, and when there are multiple ways that you can read something, the process that, as the court knows, that you use is say, okay, what are the reasonable interpretations of what is being written here, and then we take out the toolbox, and you look at the language, as the court has indicated, canons of construction, intent, context, and then figure out which one of the reasonable interpretations is the best interpretation. All right, Mr. King, I would like for you, before your time runs out, to address the deference question. Okay, I would be happy to do so, your honor. The one thing that I would say, your honor, is the City of Salisbury plan means something. I think we can agree with that, and what has happened here is that FERC has written out of the Board of Quality Certification that language, because they do not go out and find out what the City of Salisbury design is. It would have taken very little effort for them to do that, and I think the record is clear, and I'll just refer to the brief on that. On the deference issue, I would say this, your honor, the deference policy or the deference approach makes complete sense, and the idea, obviously, and I know I'm preaching to the choir here, is that when you are dealing with an agency that has an area of expertise, then it makes sense to defer to that agency. But the fact that the folks at FERC can look at a design and say whether or not a dam is well made, with the fact that they're engineers, does not make them experts in North Carolina water quality standards or policies or regulations. But what do relative to the expertise of the particular agency, but the fact that Congress has given decision-making power to a particular agency? I think that's a great point, your honor, and here's the way I would look at it. This is not a situation in which Congress has said that FERC gets to make these decisions. The Clean Water Act is very clear, and what the Clean Water Act says is that the state of North Carolina is the beginning and the end of the decisions about the water quality in this situation. The Clean Water Act is set up that way for a reason, and that's because the people sitting over in Raleigh who have the biological and geological expertise and understand the action, ought to be able to make decisions about that, just like the people in Florida make the decisions about the Everglades. This is in the context of a license. Do you contest that FERC enforces its own licensing provisions? The Federal Power Act gives FERC the responsibility for this license? Yeah, well, they do have responsibility, your honor. I believe we called the Supplemental Authority late yesterday that there's actually been a DC, I'm sorry, a California district court decision that says that the rule that was adopted by the Trump administration in 2020 that says that the federal agencies or the exclusive enforcement authority is vacated and improper. This was written by experts in North Carolina law, experts in North Carolina hydrogeology, one of the things that I think is missed here by FERC and their argument is it's not simply that this is not in their area of expertise. We're talking about something that was drafted by another sovereign power, and the question that I would ask reportedly the court is, would we defer to FERC if they were interpreting the Italian tax code? But Mr. King, this provision has been adopted per the law into FERC's license, so are you positing a situation in which for licenses that are 50 years long, we have to figure out where different provisions came from, and if they came from places that are other authorities or other agencies or state entities, then they don't get deference for that part of the interpretation, whereas they might with who originally drafted the language when it's all been incorporated into FERC's license, and FERC is indisputably responsible for interpreting and enforcing that license. Well, your honor, I agree with that to a certain extent, but when the Clean Water Act is set up, the state of North Carolina is the decider, to use a word that's not really a word, about water quality issues under a federal license. So I see where your honor is coming from, and you may have a situation where 50 years from now we have to interpret something, but this one's straightforward under the Clean Water Act. This is the state of North Carolina's call. Where did you ever argue in any of these proceedings and preserve this argument that FERC doesn't have enforcement authority, so that that makes the California case somehow relevant here? You didn't argue that. Well, no, we did not argue that, your honor. I think the position that we took was that the 2020 rule is inapplicable to this situation because we're dealing with proceedings that began before that. So my point, your honor. So this one's not in this case? Correct, your honor. Yeah, we agree. I would love to be able to take some advantage of the ruling by the court in California, but I can't do that honestly, and therefore I can't do it. I believe I've run way over my time. Okay, we'll keep going while judges have questions. So I have another one for you, which is, what do we know, if anything, about the position of the North Carolina Water Control Agency on the specific interpretive questions before us? They haven't, to my knowledge, sought to intervene or file an amicus brief or otherwise let us know what their position on this is. And the reason I ask is, let's assume you're right that the best entity to interpret Condition 9 would be the North Carolina Agency, but they're not here. And so really the only choice we have is as between this court and FERC. And FERC might not be the greatest experts on North Carolina water law, but they're probably a little more expert than we are. I frankly, I respectfully disagree with that, Your Honor. I think that nothing shows FERC's lack of competence in the area of North Carolina water law than the work that they have done in this case. They have interpreted a water quality certification to allow violations of water quality standards, which even saying that doesn't make any sense. And yet North Carolina has not sought to intervene or otherwise object. Well, they did write the letter that I referenced earlier in 2018 where they took issue with the Kew Hydro Plan. I would have loved for the state of North Carolina to come in here and weigh in on this issue. My take is that they've got bigger fish to fry and other issues and they figure the city of Salisbury are big boys and they can deal with it themselves. I agree. It would be easier if the state was in here, Your Honor. Mr. King, can I just ask you, because you keep suggesting as though this is the end of the road. Tomorrow the thing will be built and the city will be flooded. It seems to me that we just have sort of the beginning of the process. The condition says provide a plan. FERC has required a plan. They've looked at it. They've given it the go ahead, but everybody knows, as the condition says later in the text, that the plan shall be developed in consultation with the city and that FERC has licensing authority over this moving forward. So aren't you too early to be making these kinds of arguments about FERC's arbitrary and capricious action and the city's going to be flooded, etc. Don't we have enough time to see how this plays out? Respectfully, Your Honor, the answer is no. I understand that it says that Cube Hydro will work with the city, which in itself doesn't mean anything. It's a legal matter. This is a one-step process and the one-step process is the licensee presents a plan and FERC signs off on the plan. There is not a multi-step process where you put in a draft plan, it looks good, and bring us a revised plan, and that looks good, and bring us a revised plan, and that looks good. No, but let me ask you this. I thought there were other conditions that did require that this ultimately be implemented consistent with state law. And thus, as the licensor, FERC could, pursuant to subsequent petitions saying that Cube is not doing what it's supposed to do, that there are violations of state law, couldn't FERC at that point intervene and disapprove and say they have to do something else? I agree that FERC has that ability and to go to Judge Cassis's question earlier, I agree that the state of North Carolina could come in later and say you're violating water quality standards, but the problem is... Sorry, go ahead. Finish your answer. I was just going to say that the problem is that we are where we are today and as near as we can tell, I mean, FERC accepted the plan from Cube Hydro literally without any comment or, I'm sorry, any modification, and their only explanation... My recollection is that they accepted one of your objections and wrote it in the rehearing process. That was for the access element, Your Honor, but you're right. I overstated the case. This has three elements. There is the building element, the access element, and the dredging element. They accepted the building element, which is what brings us here today, just wholesale. They just put the stamp of approval on it. Your Honor is correct that on the rehearing, they did make some changes on the access issue. North Carolina, as I understand, it has ongoing regulatory jurisdiction over this project, so isn't it the case that if the North Carolina Water Agency ends up agreeing with you, I mean, they just didn't come in. They have bigger fish to fry, but at some point, they take a look at this and say, no, no, this is a real problem. Can't they just impose a new condition? Well, I'm not sure if they can come in at this point and change the condition. I think they could come in with an enforcement action, Your Honor, and to go to Judge Jackson's comment, FERC could come in and do something later, but the record is 13 1⁄2 years ago, Respondent itself said the cause of the problem is their licensee, and 13 1⁄2 years after that determination was made, we're sitting here with FERC basically ignoring what has been where it seems like the North Carolina Agency has ample tools going forward to protect its interests in clean water, non-flooded pump stations, whatever it is. I thought they could change the condition, but they certainly have other means, right? I mean, the first thing FERC said was, gosh, we don't care very much about this at all because there are all these remedies under state law. So, we have a somewhat expert federal agency, and we have a very expert state agency that has ample tools to fix things going forward, so why wouldn't we, under those if it ends up that FERC and the North Carolina authorities disagree, the North Carolina authorities can take care of themselves? I agree with the Court that that is theoretically possible. What I would say to the Court is there is no indication that that is ever going to happen. There is no indication that the state or FERC is going to change anything that they've done at this point, and I will add, and this is in the record, I mentioned it's been 13 1⁄2 years since we was flooded twice in 2020 to the point that we had to evacuate the building and shut it down, and members of the Court, we are not talking about a building that was built to be flooded. We are talking about a brick-on-brick masonry building, and what FERC has said is it is okay for sewage laced water that contains trees and debris to slam into that building, and that the city's just got to live with this, and one of the points that I would make is what would the layperson reaction be? The layperson reaction is, look, if somebody is flooding my property, the answer is not that a judge is going to say, well, you're just going to have to live with it, or that the person that floods it says, I'll get you a good pair of boots. Everybody understood as we were going into this that the details, the devil's in the details, but we all knew we were not going to end up with a building that was flooded. Okay, Judge Jackson, any other questions? Judge Ginsburg? No, thank you. All right, thank you, Mr. King. Mr. Fish, we'll hear from you. Good morning, Your Honors, and may it please the Court, Jared Fish for the Commission. Mr. King kept referencing compliance with water quality standards, but that's what we're here disputing. Whether CUBE-Yak-Kin complies with Condition 9b to North Carolina's water quality certification determines whether CUBE has complied with water quality standards. That's the whole point of issuing water quality certification and conditions there, too. So, the question here is whether CUBE-Yak-Kin complies with the requirements of Condition 9b, and here's where the Court should dispense with this case very easily, because there is no preserved dispute on the main issue. Under either the Commission's interpretation of Condition 9b, or under Salisbury's interpretation of Condition 9b, which we disagree with, but even under their interpretations, say that the baseline standard is whether CUBE's plan achieves the same benefits as a protected duct. That's in their definition. It's in our definition. You don't even need to look at whether the phrase City of Salisbury's design modifies the first clause physical modification. I'm sorry, Mr. Fish, you were breaking up a little bit, so I'm not sure I heard your entire statement. What is the reason why there's no preserved dispute on this? I the reason is under either our interpretation, and we make this point in our brief at page 34 to 35, under either our interpretation or Salisbury's interpretation, the baseline question, the baseline standard, is whether CUBE's plan achieves the same benefits as a protected duct, and they make no argument in their opening brief that CUBE's plan does not achieve the same benefits. Is that right? If consistent with Salisbury's design modifies physical modification to the facility, which it's a tough reading, but you say this question doesn't matter. So, well, if Salisbury's interpretation is right, I mean, their design with regard to physical modification is a new pump station that would stay dry. That's correct, Your Honor, but they It's very different from, very different from CUBE's proposal. Right, and I have two answers to that question, Your Honor. First, that goes to the point that their definition is internally incoherent because they admit, as they must, that one compliance standard is a protected dike, because that's right in Condition 9b, and they also admit, as they must, that the last clause that Your Honor identified earlier, or achieves the same benefits, goes back and modifies protective dike. They also say it modifies City of Salisbury's design, but that doesn't make sense because, as you pointed out, Your Honor, a protective dike is not the same thing as City of Salisbury's design. That goes to our argument that it doesn't make sense to read City of Salisbury's design as modifying the first clause physical modifications. I'm sorry, I thought Salisbury's design as relevant to physical modification. They think it's relevant, so they would say consistent with Salisbury's design means build a new pump station on higher ground. Correct, Your Honor, but they also say that Condition 9b allows for a protective dike, and so here's the incoherence. They say that a protective dike is consistent with the City of Salisbury's design. That makes no sense. Let me ask you this, Mr. Fish, because I understood that at least one of the three plans that they could be referencing in City of Salisbury's design was a plan that included a protective dike and pumps inside the building such that the floor stayed dry. Am I wrong about that? No, that's correct, Your Honor. That's McGill's study from 2007 that proposed both a protective dike and other measures including dredging of the river and a new flood station, but there's nothing to indicate, and here's the key, there's nothing to indicate that that plan is necessary to meet Condition 9b's requirements. That's the question that we're asking. It's sort of circular, I think, in your reasoning. There's nothing to suggest that it's necessary to fulfill the condition, and it seems a little hard to me to, without deference, let's set aside the deference point, but without deference it seems a little bit hard to reach the conclusion, looking only at the text, that the same benefits of a protective dike are what you say they are. Well, Your Honor, that goes to why the Commission looked to the record evidence. It looked to North Carolina building code for constructing in floodplains. It looked to professional engineering designs, American Society of Civil Engineers codes 24 and 7, and it looked at evidence in the record to determine what North Carolina meant. As we stated in paragraph 25 of our rehearing order, North Carolina could have, they had all the control in the world to identify what the key benefits would be, but they didn't. They left it up to FERC, the undisputed enforcer of this condition, to determine what the key benefits are. As an interpretive exercise, why is that different in time than Mr. King and petitioners looking to the plans that were in place at the time this was adopted and saying, obviously, everybody understood that there was going to be no flooding? Well, I push back that everybody understood that there was no flooding. So just because we have plans in the record that went above and beyond what TBF is proposing doesn't mean that the plans in the record that go above and beyond what TBF is proposing are necessary, set the floor for determining compliance with Condition 9B. There is nothing in the record to indicate that North Carolina had a different interpretation. What Mr. King refers to, the one letter, the June 2018 letter, J391, North Carolina is referring to flooding at the intake structures. It's not referring to flooding of the pump station room. It's the intake structures. But Salisbury's contention is we can't have flooding in the pump station room. We need to have a completely dry pump station at a higher elevation that's reconstructed someplace else. Mr. Fish, would a protective dike provide for, assure a dry pump room station? Well, as we noted, it's unclear, Your Honor, because a protective dike can mean to either confine water or it can mean to control water. Those are two different things. We note the definitions of protective dike in our brief. So the question is, well, if you're controlling flood water, as you mentioned earlier, Judge Ginsburg, what is the benefit? We're looking at what is the benefit to be achieved from a protective dike, not that whatever measure is implemented is a protective dike. Let's take North Carolina's assertion that what is required here is a dry pump room. So would a protective dike provide that? Conceivably, it could provide that, Your Honor. I believe the McGill study plans to provide that protection, though they also said we need to have a new pump, new flood pump within the building in flood events. And I'll mention here, there's actually a way that the McGill study is less effective than Cube's study. In McGill's study, they proposed keeping the flood room floor at, I think it was 642 feet, it might have been 643 feet. They didn't propose raising it at all. Cube here has not only proposed raising the three that is consistent with North Carolina law, professional engineering standards, and by the way, what all parties agreed to back in June 2018, Salisbury also agreed to that building height, that's a JA404, an email from Jim Beamer. But they also proposed raising the floor, either through a mezzanine, building a mezzanine, or actually reconstructing the floor to ensure that it's at a height where the pumps would be accessible during a flood event. The McGill study doesn't even propose doing that. So again, it comes back to, what are we talking about? As you mentioned, Judge Ginsburg earlier, we're looking at what are the effects of a protected dike. The Condition 9b does not specify what are the key benefits, what are the key effects that we're looking to. So it was up to FERC to make that determination. But I mean, Mr. King has a pretty powerful, intuitive argument that, come on, you're talking about a flood protection plan, and the plan is you flood the building but raise the key equipment in the air, and there's all this business of, you know, the plan includes amphibious equipment to get to the stuff. So like, the plan stays on, but the people who run the equipment need to put on scuba gear to get up there to run the equipment. I mean, is that, would anyone understand that as a reasonable flood plan, flood control plan? Well, actually, Your Honor, the Commission found that that was not reasonable. So in the hearing order, it rejected the amphibious vehicle method for ensuring access to the pump station. It rejected the second, the CUBE's plan that sought compliance with the second part of Condition 9b, which is improved access to the pump station with the road. It said amphibious vehicles don't cut it. We need workers to be able to access the flood station in a dry environment in a flood event. So FERC sent that part of CUBE's plan, not in dispute here, not an issue here. Okay, fair enough. So I'll retract the rhetorical flourish, but the point is the plan still contemplates that people have to get through floodwaters to go up to the equipment in the floodwaters in the building. I don't believe that's correct, Your Honor, because again, in addition to raising the pumps, CUBE is proposing to build a mezzanine floor to above the floodwaters to ensure that there's dry access, so that even if the pump station room is flooded below that level, there's still dry access. And in September of this year, it's beyond the record here, but in September of this year, CUBE filed a revised, sorry, earlier than that, CUBE filed a revised plan to ensure improved access with the road, and the Commission recently in September approved that aspect of the plan. So you have soup to nuts dry access to the pump station facilities during a flood event, notwithstanding that lower levels of the pump station might be flooded during a 100-year event. And the key here is there's nothing in the record to indicate North Carolina found that floodwaters reaching below a raised mezzanine or reaching below the pump, the actual pumps themselves is non-compliant with Condition 9B. And again, North Carolina had all the control in the world. They could have written Condition 9B more specifically to say, you need to have a dry pump room. They could have written it to say, you need to construct a new relocated pump station, like in the Black and Beach study. What is First's position about whether or not a flooded pump room is consistent with North Carolina law? Mr. King opened with the suggestion that flooding the pump station could not be the right interpretation because it would otherwise be a violation of North Carolina law, and so therefore the condition should not be read that way. Your Honor, Mr. King didn't identify what North Carolina law he's talking about. And again, this goes back to the point that ensuring compliance with North Carolina is why we have Condition 9B in the first place. The question here for determining compliance with North Carolina law is whether CUBE complies with Condition 9B. So it all comes back to whether CUBE complied with Condition 9B and what 9B means. I thought Mr. King did read a provision of North Carolina DEQ regs or their statute, I don't know which. Well, pardon me, no. He read from North Carolina's statute, but I don't know if that's the right direction for the plan to deal with the effects of flooding. Your Honor, that's right. That's in the June 2018 letter, the effects of flooding of the water intakes. That's separate and apart from discussing flooding of the pump station room. All right. And that's all North Carolina said about it. And again, North Carolina had another opportunity to comment on the plan. In April of 2020, North Carolina wrote another letter. And this is after the commission issued its initial order approving this aspect of CUBE's plan, the physical modifications to the pump station facilities. And it didn't have any objection to what the commission did at all. All it said was, actually, we took the provenance of Condition 9 is FERC's own words taken nearly verbatim from FERC's 2008 Final Environmental Impact Statement. And if you look at JA-171, that was FERC Environmental Measure 17 attached to its Final Environmental Impact Statement. It's the same. It's the exact same wording. So all North Carolina did was it said, okay, we'll take that language. You, FERC, opted not to include it in your 2016 license, but we're going to include it in our water quality certification without any embellishment, without providing any more specifications on what we think is necessary. We're just going to take, FERC, what you said. And if anything, that bolsters the case for deference to the commission in interpreting this provision. We wrote it originally. I may not be understanding what the CUBE plan allows, at least based on your representation. So I read it as offering two alternative solutions. One is to raise the entire pump station building. Or the alternative is to raise the operating equipment within the pump station building, put it on an elevated catwalk within the existing structure. Is that fair? Correct, your honor. I don't know if I construed the first option as raising the whole building as raising. Okay, but I'm more, I'm actually more interested in the second one, because the second one does seem to contemplate compliance in a scenario where the physical building of, the physical building is flooded, but the key equipment is above the water level and therefore can run. Correct, your honor. Okay. And which brings me back to my question a while ago. Does that really seem like a flood control plan? I mean, you referenced professional standards. I mean, if we were to look at professional standards for water intake facilities, would we see some principle that it's fine for the building to be flooded as long as the equipment is up on stilts? In a word, your honor, yes, because the American Society of Civil Engineers Code 7, which we relied in part on, says you need to raise essential structures to two to three feet above the 100-year flood level. Salisbury does not dispute that the 100-year flood level is 648.7 feet. Salisbury does not dispute that if you raise the three pumps, the essential structures, to 3.6 feet above that level, 652.3 feet, that they will continue to operate. Salisbury does not dispute that the remaining equipment that would be submersed would not be able to operate during a flood event. There's simply, there's no dispute on the main point. And I go back because we're talking about what is the effect, what is the benefit of a protective dike. Salisbury does not dispute in their opening brief that CUBE's plan does not provide the same benefits as a protective dike. That's the whole ballgame. You just switched from the singular to the plural, so that prompts my question. How come surviving the 100-year flood is the only benefit when the condition calls for first the benefits plural? Well, your honor, the last clause, or achieve, or other feasible options for achieving the same benefits refers back to the first clause, physical modifications to the pump station, and it refers back to the second clause, improved access to the pump station with the road. So right there, you've got two benefits. One benefit derived from physical modification pump station, another benefit derived from improved access with the road. But even if that weren't the case, there are other benefits that are provided by CUBE's plan. They provide measures to reduce debris accumulation in the pump station. That's actually a concern that Salisbury has raised in the past. So not just maintaining continued operation of the pumps themselves, but also removing debris. Also dry access to the pumps during a flood event by building the mezzanine or raising the whole floor. That's another benefit. So whichever way you cut it, CUBE has complied with the plural benefits in Incondition 9b. Mr. Fish, can you discuss deference? Is it FERC's position that FERC is entitled to deference in this situation, and if so, why so? Yes, your honor, and it's because of what you as it did. It wrote it to say that any conditions imposed in a state water quality certification shall become part of the FERC license. And they could have just said a state gets to issue a water quality certification with conditions, and that's a standalone document that is implemented by the state. It is enforced by the state. They didn't have to give FERC any control over that, but they did. Congress entrusted, actually made it FERC's responsibility to administer water quality certifications, and under Emirata Hess, as the court said, the requisite expertise, which is the basis for granting deference, is reflected in Congress's grant of jurisdiction to the agency charged with implementing that provision. That's exactly what Congress did here in section 1341d of the Clean Water Act. And, you know, suppose North Carolina had intervened and said, no, no, we think that Salisbury's interpretation of condition nine is the right one. Would you still be claiming deference? In a word, your honor, yes, I think we would, because, again, Congress said, look, state, you have all the power in the world to write your conditions as you'd like. And as court cases have said before, the American Rivers case, the Second Circuit case in 1997, FERC must accept those conditions, hook, line, and sinker. We can't modify them. We can't reject them. That's exactly what we did here. But once it's part of the license, Congress said in the Clean Water Act that it is part of the FERC-administered license. And, in fact, the Second Circuit in American Rivers also said FERC enforces those terms. Now, that seems like a very strange assignment of interpretive authority in a scheme where the state is, the state agency is the composer of the condition. And FERC is very specifically disabled from changing the condition. And you're saying, well, okay, but we get to change the condition within the bounds of interpretive ambiguity, even as against the competing state interpretation. That seems odd. Well, your honor, it doesn't seem odd if you look at what's, what makes FERC's determination reasonable. FERC's determination is only reasonable if we consider what the record reflects. So, if North Carolina had said in its June 2018 letter, what we meant by condition 9b is a new relocated pump station, it's the Black and Veatch design, which they could have easily done, but they didn't say that. It's the Black and Veatch design from 2011. That's what we interpret condition 9b as requiring. Well, then, arguably, FERC would have been unreasonable in interpreting condition 9b as doing something else, but that's not in the record. Okay, but let's just assume, let's assume genuine interpretive ambiguity. In other words, there are two different answers to the question before us that are reasonable, right? Which is the only circumstance in which deference matters. I don't know why we would follow FERC as against North Carolina. Well, again, yes, it would be a closer issue, your honor, if North Carolina had submitted different comments, if it had intervened in this dispute, if it had filed or even filed an amicus brief in this dispute, or at any point said something differently. Perhaps that would be a closer question, and maybe the standard wouldn't be so much Chevron deference. Maybe it would be closer to Skidmore deference, whether our interpretation is reasonable under all the circumstances and has the power to persuade. But as you mentioned earlier, Judge Katsas, the question here ultimately is between who gets to decide in this situation, FERC or the court? And Congress said, FERC, you do have some expertise in implementing water quality certification conditions. We've said so by way of granting jurisdiction to enforce a Clean Water Act certification. And do you agree that this scheme leaves the North Carolina agency with options going forward? If, let's say, hypothetically, we rule for the commission in this case, the North Carolina agency has concerns, they want to toughen up the condition, do they have means for doing that going forward? I'm not sure I would agree that, well, I'd say that there are means for holding Hube Yackens to the fire. I'm not sure about North Carolina. So this would be a different issue, perhaps in a different case, whether North Carolina can come back in and change its condition. Let me slightly modify it. Do they have means for protecting the water control interests, either through modifying the condition or just through whatever mechanisms that are under state law for enforcing state law? So in condition seven of the water quality certification, they do reserve the rights to enforce violations of its conditions. We have not disputed that. That's not on consideration here. So I'm wary of prejudicing my agency and saying what the latitude for North Carolina is in the future, but they certainly reserve the right in condition seven, and we did not dispute condition seven. But I'd further note, Salisbury also has recourse with the commission. As this court said in its North Carolina case, under 16 U.S.C. 825H, the commission has broad remedial powers to revoke a license, to suspend a license in case of violations. And as this court said in the Alcoa case, at Insight 974, which also dealt with certification conditions, the commission can suspend a license in the case of a water quality certification violation, and Salisbury can petition the commission to take such enforcement action. Our regulations, 18 CFR 385.703, provide a party with the power to file a motion for remedial relief that's within the discretion of the commission, and we have that remedial discretion. Mr. Fish, is this also the answer to their point about the proposals being so preliminary and FERC was acting arbitrarily because they don't have enough information or details? Is the answer, well, as the license proceeds and the plan is actually implemented, FERC still retains the authority as the licensor to oversee it, in some sense? FERC certainly retains the authority to oversee it going forward, yes, your honor. I would say that that argument raised by them is jurisdictionally forfeited because they didn't raise it in their rehearing application, and as to Salisbury's point that, well, the first time FERC used the word conceptual design was in the rehearing order, Hughes' plan didn't change between the time of the initial order and the rehearing order. If it was too conceptual for Salisbury for purposes of the initial order and including that objection in their rehearing application, the same thing adheres, the same objection adheres whether you're talking about the rehearing order or the initial order. So that issue is jurisdictionally forfeited at the outset, but again, this goes back to North Carolina having all the power in the world to tell FERC what to do, but leaving it ambiguous. They didn't define what a plan was to be, and the definition of plan ranges from anything conceptual, a goal or an aim, to something more comprehensive, an intention to do something, or something even more comprehensive, a detailed formulation of a plan of action. None of the definitions actually are Salisbury's preferred definition, which is a certain set of modifications or a final design. Can I just be clear on your forfeiture point? Because I understood that CUBE did say things like this plan is not going to protect the pump station from future settlement and flood impact at JA866. The CUBE's plan would allow for the station to be flooded in that same way, and this was in the rehearing request. So why is it that you think that this is not sufficient? I'm looking at JA860 and 866. Let's see. Well, that's, so right. So your honor, that is, those are objections to the actual elements of the plan, if it was to be designed. That's separate and apart from arguing that the plan is not definitive enough to know whether it's for safety or whether it will cause debris accumulation. We understand that, well, taking their allegations as true, we understand that a new relocated pump station wouldn't have those same, say, negative effects. But that just points to the laser focus Salisbury has on ensuring that any CUBIAC in design is a new relocated pump station because they want the 2011 Black & Veatch report to be the definitive baseline. All right, but what about what about page 874? CUBE all but admits that its plan is not sufficiently developed for meaningful review. The commission staff approved the plan anyway. That seems to me to be directly the argument that you say that they forfeited, and so I'm still a little confused by this forfeiture argument. I'm looking at 874 in the middle of the page at P. CUBE all but admits the plan is not sufficiently developed for meaningful review. Perhaps, your honor, but I'd say that that's distinct from arguing that it's just simply a conceptual design that can't be implemented from something that's final design or a certain set of modifications. But even on the merits, we win here because there's nothing in Condition 9b or in the definition of plan that requires it to be a certain set of modification or a final design as Salisbury would like it to be. If I could just make a point on the... Can I just ask one odd aspect of this case to me? This goes partly to your comments about the latitude that North Carolina would have going forward and may also go more broadly to the question of deference, which works a little bit schizophrenic here about whether they really want to own this problem. I mean, they said on the front end, they said that something like Condition 9 isn't even necessary because there are all sorts of remedies in state court under state law for people like Salisbury to protect their interests. I think they even said that FERC lacks authority to afford redress to people like Salisbury. And then on the back end, I think there were certain micro objections about things like mold issues and such. And FERC's response to that was, we're not going to start adjudicating mold issues. Take that to the appropriate state authorities. So you sort of want to own this, but not really. And why should we give you deference under those circumstances? Well, Your Honor, first, if I could push back on the premise of your question. FERC has not said it didn't want to own this. It said... It was FERC that first raised the issue of sediment accumulation and its impact to the pump station in the 2008 Environmental Impact Statement. It was FERC that raised that. All FERC said was, we don't think we have this roving power to impose restrictions on other facilities, on anything that our licensed dam might affect. We don't have this roving power or responsibility to do that. We don't think that's within our jurisdiction. So it was a question about authority to do something, not whether it was feasible or... Sorry, tell me if I parsed this wrong. I'm reading from my notes. You said in the initial order approving the plan, you said that FERC had deemed the condition unnecessary because FERC has no authority to hear claims about the impact of a dam on third parties like Salisbury can seek redress for whatever harms to prevent or get compensated for whatever harms it may suffer in state court. And you said that Section 10C of the Federal Power Act expressly preserves that ability. Your Honor... It's like it's a pretty hands-off approach, not a hands-on approach. I believe what we said, Your Honor, was in any event, the original Environmental Measure which is the same thing as Condition 9B to the Water Quality Certification isn't necessary because North Carolina included it in its Water Quality Certification. So we all get to the same end results here. And yes, we said that if there are problems with flood impacts to the Salisbury Pump Station caused by QB Atkins Dam, then proper redress is in state court. That is consistent with what this court has said about seeking review of state-imposed Water Quality Certification. In the Alcoa case, we said expressly the place where an interested party challenges a violation to a Water Quality Certification itself is in state court. So we simply... Which tends to suggest that ongoing enforcement and administrative authority is vested somewhere other than in the commission. No, Your Honor, because again, Congress said in Section 1341D that the certification conditions become part of the license and it's always been understood. I don't have enforcement or administrative power to implement Water Quality Certifications once they're part of the license. And if I could just add a coda to that statement, Salisbury submitted a 20-J letter last night regarding the Northern District of California's remand of the 2020 Section 401 in Water Act rulemaking. That doesn't affect this issue at all. The enforcement authority for FERC over Water Quality Certifications existed long before as the Second Circuit recognized back in 1997 in the American Rivers case. That was just one small piece of that rulemaking where EPA simply confirmed that authority. That rulemaking and EPA seeking a voluntary remand of that rulemaking was about several other issues and, in my opinion, much larger issues. So that vacature of that rulemaking from 2020 has no effect whatsoever on determining whether FERC has enforcement and administrative authority over Water Quality Certifications. Okay. That's all I have. Judge Jackson, anything else? No, I'm all set. Thank you. Judge Ginsburg? No, thank you. Thanks. Mr. Fish? Mr. King will give you a few minutes for rebuttal. Thank you, Your Honor. I'd like to make five quick points, two of which are just providing information that Judge Ginsburg asked. I had read earlier language in the Water Quality Certification that requires compliance with Water Quality Standards, and I apologize for not having that slide earlier. That is at JA196 in the middle of that page. The entire purpose of Water Quality Certifications is that you have to cannot violate a Water Quality Standard and simultaneously comply with a Water Quality Certification. Judge Ginsburg also asked whether or not protective document situation keeps the building dry on the inside. I agree that that language in the abstract, counsel may be correct, and you can read it a couple of different ways, but that language is actually contained, that phrase is contained in Condition 9. In the record, there is only one plan that refers to protective docs, and that is one of the three plans that existed at the time. That's McGill. I'm sorry? That's McGill. Yes, yes, correct. That one did require the building to be dry on the inside. I just wanted to address those two things. The bigger point I wanted to make here, I mentioned earlier that there are a lot of tools that the court can use. The tool that is overlooked here is common sense. The whole goal here is figuring out what DEQ meant. Do we really think that the State Environmental Quality Agency wanted and expected the water intake building, the pump station, to be flooded with contaminated water in a building that cannot stand the impact of contaminated water, for their employees to be perched over these contaminated flood waters on some sort of catwalk? When we said to FERC, this is not engineering, this is not possible either as a matter of engineering or as a matter of law, FERC's reaction was, that's not our problem. Apparently, that's the City of Salisbury's problem, that the thing that FERC has approved cannot be done. Why wouldn't it be CUBE's problem if they cannot build what they're talking about, and they've got to do something else? Well, to a certain extent, you're correct, Your Honor, but how much time are we going to spend with them not getting it right the first time? Here is the point that I want to make, Your Honor. The problem that we've got here is that while Condition 9b is not clearly written, it clearly is referring to a City of Salisbury design. The interpretation that has been made by FERC acts like the State of North Carolina does not exist. When you're interpreting language that is ambiguous, you choose the potential interpretations of the language that you have, and what FERC has done in this situation is torn that page out and thrown it away and said, well, you can live with a hundred-year flood because everybody agreed that that's the goal, which is an absolute false statement. The idea of flooding the building but raising the equipment is a little counterintuitive to me, but what's your response to Mr. Fish's point that there are recognized industry standards of flood protection and that is one thing that is a permissible option? Well, it may be a permissible option as a matter of engineering if the State of North Carolina was not in charge of this, but the State of North Carolina has used the phrase the City of Salisbury's design and that has got to mean something, Your Honor, and the first thing that FERC should have done when they sat down and said, you know, gosh, they said the City of Salisbury's design, what are they talking about? Okay, and that goes back to your major interpretive point. I guess I'm just trying to see if there's a separate common sense point that, like, you know, no competent engineer would think that you can flood the building and raise the equipment, and it sounds like that instinct is wrong. Well, I mean, that's exactly right, and I will tell you, Your Honor, the thing that I found most shocking when I got involved in this case was that when the City of Salisbury said, look, here are the engineering studies that show that what Q-Hydro was talking about doing doesn't work and cannot be done, and they have to comply with the requirement of sound and prudent engineering, FERC said we don't have to comply with that standard. Isn't that standard one that comes from FERC's regulation relative to actual projects that it is approving? Well, I think it is, Your Honor. I think that the finer points of that are addressed in our brief, and I would just defer to our brief on that. I mean, I don't know how you can have it both ways, Mr. King. You've been saying over and over again that this is a North Carolina thing, that this is a North Carolina water quality, people are controlling it, and yet somehow in this moment, you would like to have the court import a FERC regulation and say that FERC should be faulted for not having applied it. No, actually, that's a great point, Your Honor. I wish I thought of that before I started saying these things. Here is my point, Your Honor. I think that that regulation sets a floor on what FERC can do. It doesn't provide the answer, but I think what it means is whatever it is that FERC approves, it has to be something that you can actually do as a matter of engineering. This is the state's call, but whatever they do, they've got to get that part of it right. It's got to be a matter of proper engineering, and if I could, I'd just make two real quick points. As the Supreme Court said in Kaiser v. Wilkie, consider that if you don't know what some text means, you would probably want to ask the person who wrote it. Now, we think that this court ought to reverse and say and interpret that language in Condition 9b to mean the Black and Beach Court or something that yields a similar benefit or the same thing. I think I understood Mr. Fish to say that FERC wrote it originally. Maybe I misheard him, but did you hear that, and if so, what's your response to that point? Well, there is similar language, not identical language, but very similar language in the EIS, and I agree with that, and I believe that DEQ took that language and modified it for their own purposes, so I think counsel's about 85% right on that. It is similar, but it is DEQ's language, ultimately, and it was DEQ's call under the Clean Water Act as to what language they used, but as they say, there's nothing new under the sun, and people frequently borrow work from somebody else. Doesn't that, at a minimum, undermine your point on deference, that if this was language that the state originally adopted from the EIS and used to its own purposes, then aren't we back to FERC should be given some deference with respect to how it should be interpreted? Well, I think Your Honor would be correct if we were not operating in the context of the Clean Water Act, but the Clean Water Act is built around the idea of federalism. It's built around the idea the state of North Carolina in this situation is not consulted on this. They do not get input. They do not get to look at a draft. They are the beginning and the end of the discussion, and that has been provided by Congress, and I don't think it matters, frankly, Your Honor, if DEQ copied 50 pages word-for-word. If it's their water quality certification, it's their water quality certification, and what they say is the end. When counsel for the city spoke about this language coming from the EIS, he used the word verbatim. Are you saying that's not quite accurate? I do not think it is verbatim, Your Honor. I think it is very close, but it is very close. I think there are some very small differences. The last point that I would make is simply to refer the court to the Federal Power Act, and if the court will bear with me. Federal Power Act provides each licensee here under shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or the works of pertinent or accessory thereto constructed under the license. Now, the courts have said that does not mean that PERT can issue damages. They cannot make Q-Piterot pay the city of Salisbury damages. Well, if they can't make them pay damages, what does it mean? It means that whatever it is that's being done by the licensee has got to be fixed, and I go back to the layperson's interpretation. If somebody is flooding your property, you know at the end of the day whatever the answer is going to be, it's not going to be you got to suck it up. Your property is going to be flooded, and that's just too bad. That's what the federal government said in the city of people of Salisbury. That's just too bad. You're just going to have to live with a flooded building. That cannot be what DEQ had intended. At the very least, Your Honor, we would request that you remain until the PERT can go to the people that actually wrote the language and say to DEQ, look, help us out. We've already been to the D.C. Circuit. It's all about what you intend. What exactly did you mean when you said the city of Salisbury's plan? But it is not flooding the building. As that song goes, you can't get there from here. Okay. Court's time. Judge Jackson, anything else? No, thank you. Judge Ginsburg? No, thank you. Thanks to both counsel for helpful arguments. The case is submitted.
judges: Katsas, Jackson, Ginsburg